NORDSTROM et al. v. SIVERTSEN–JOHNSEN MINING & DREDGING CO. et al.

(Second Division. Nome. December 19, 1914.)

No. 2565.

MINES AND MINERALS ☞116—LABORERS' LIENS—PRIORITY OVER ATTACHMENTS.

The plaintiff lienors were laborers on a dredge belonging to the defendant Sivertsen-Johnsen Company, engaged in dredging gravels in their natural beds for the recovery of the gold and gold dust contents therein. They brought a consolidated suit to recover on liens, claiming prior lien on the gold and gold dust so extracted from the said gravels by the dredge as against prior attachments by the other creditors. *Held*, the priority of lien claims given by section 164, Comp. Laws Alaska 1913, over attachments, extends only to mineral-bearing gravels excavated, hoisted, or otherwise piled into "dumps," and the proceeds thereof, and not to gold or gold dust so extracted by the dredging process.

In the case of Albert Meyer & Co., a Corporation, v. Sivertsen-Johnsen Mining & Dredging Company, a corporation,

No. 2550, a writ of attachment was issued against the defendant on September 18, 1914, and executed by the marshal on September 21, 1914, under which he now holds a certain amount of gold dust.

In the case of Solomon River Dredging Company, a Corporation, and Seward Dredging Company, a Corporation, v. Sivertsen-Johnsen Mining & Dredging Company, a Corporation, a writ of attachment was issued on the 15th day of October, 1914, and executed on the 15th day of October, 1914, by the marshal, and under which he now holds a certain amount of gold dust or amalgam.

On the 7th day of November, 1914, Frank Nordstrom, John Larson, Knute Drange, Alfred Sivertsen, Robert McNutt, J. M. Johnsen, James Ennis, Gus Berness, and Peter Iversen filed a joint action, No. 2565, against Sivertsen-Johnsen Mining & Dredging Company, a corporation, and E. R. Jordan, United States marshal of the district of Alaska, Second division, seeking to recover several judgments for various sums alleged to be due them for personal services, and asking that said sums be adjudged liens on the gold dust heretofore referred to and now in the hands of said marshal, and seeking a foreclosure of such alleged liens and satisfaction of their respective claims by the proceeds arising from the sale thereof. And upon November 23, 1914, upon the affidavit of the attorney for the plaintiffs, Geo. B. Grigsby, and a motion accompanying the same, an order was issued, directed to the defendant E. R. Jordan, as such marshal, returnable November 28, 1914, to show cause why he, and all persons acting by, through, or under him, should not be restrained and enjoined pendente lite from in any manner disposing of the gold and gold dust now in his possession under the aforesaid attachments, and, until the hearing of such motion and order, he was restrained from in any manner disposing of same, until the further order of this court.

G. B. Grigsby, of Juneau, and T. M. Reed, of Nome, for plaintiffs.

O. D. Cochran, of Nome, for E. R. Jordan, defendant.

TUCKER, District Judge. As a result of the above proceedings, is devolves upon this court to construe section 164 of the Compiled Laws of Alaska, p. 153 et seq., and to

decide whether or not the lien given therein is superior to the attachment.

The sole purpose of the injunction proceeding in this case is to have the court declare the plaintiffs therein entitled to a prior lien upon the gold, gold dust, or amalgam now held subject to sale by virtue of writs of attachment issued in the cases of Albert Meyer & Co. and Solomon River Dredging Co. against said Sivertsen-Johnsen Mining & Dredging Company; said lien or preference being asserted by virtue of section 164, which section, after providing for a miners' and laborers' lien, on certain designated mineral bearing sands, gravel, etc., further provides that "the said lien shall be prior to and preferred over any debt, mortgage, bill. of sale, attachment," etc. Briefly stated, the controversy lies between the statutory laborers' or miners' lien claimed under section 164 and the attachments heretofore mentioned. Because of the rather brief oral argument of counsel and their failure to cite any authorities upon the question presented for its decision, the court must assume that this statute has not heretofore been the subject of judicial investigation or decision, and it is therefore left to the court to decide the point raised upon the general rules applicable for the interpretation of statutes. It appears from the complaint, upon which the injunction proceeding is based, and by which the defendants were temporarily enjoined from the sale of the gold dust, etc., by the marshal in pursuance of the attachments, that the plaintiffs were employed on or about the defendant's mining dredge in the several and respective capacities of engineers, cooks, laborers, winchmen, and dredgemaster. It is contended by the plaintiffs, or the parties applying for their injunction, that the lien given by section 164, and which is thereby declared a preferred lien over the attachments, covers and includes all and every kind of mineral-bearing sands, gravel, earth, or rock, without respect to whether it is piled up or collected in a dump or mass, and all gold and gold dust or other minerals therein, and all gold and gold dust extracted therefrom. The defendants, on the other hand, contend that the lien attaches only to the mineral-bearing sands, gravel, earth, or rock that may have been piled up in a dump or mass, and the gold or other minerals contained therein or extracted therefrom.

Section 164 reads as follows:

"Sec. 164. Every miner or other laborer who shall labor in or upon any mine or mining ground for another in the Territory of Alaska in digging, thawing, conveying, hoisting, piling, cleaning up, or any other kind of work in producing any mineral-bearing sands, gravels, earth, or rock, gold or gold dust, or other minerals, or shall aid or assist therein by his labor as cook, engineer, fireman, or in cutting and delivering wood used in said work, or in work in any like capacity in producing the dump, shall, where his labor directly aided in such production, have a lien upon the dump or mass of mineral-bearing sands, gravels, earth, or rocks, and all gold and gold dust, or other minerals therein, and all gold and gold dust extracted therefrom, for the full amount of wages for all the time which he was so employed as such laborer in producing the said dump, within one year next preceding his ceasing to labor thereon; and to the extent of the labor of the said miner or other laborer actually employed or expended thereon, within one year next prior to ceasing to labor thereon, the said lien shall be prior to and preferred over any deed, mortgage, bill of sale, attachment, conveyance, or other claim, whether the same was made or given prior to such labor or not: Provided, that this preference shall not apply to any such deed, mortgage, bill of sale, attachment, conveyance, or other claim given in good faith and for value prior to the approval of this act."

While the contention of the plaintiffs is plausible, and founded on what the lawmakers might have done and should have done, if they intended to deal justly and liberally or uniformly with the miners and laborers, I do not think the statute is susceptible of such construction. The language of the statute, by which we will be governed, in seeking the legislative intent, will not support the contention that the lawmakers intended to give a lien on all the mineral-bearing sands, gravels, earth, or rocks that may have been loosened up from mother earth or the original ground by or through the different processes of mining, such as hydraulic or dredge mining, irrespective and independently of the fact that the mineral-bearing sands, gravels, earth, or rocks have been piled up or collected in a dump or mass; for such is the inevitable result of the plaintiffs' contention. Had the lawmakers so intended, they might easily have used some such general and inclusive language as the following: "Every miner or other laborer who shall labor in or upon any mine or mining ground (in any capacity whatever) in producing any mineral-bearing sands, gravels, earth or rocks, etc., to be extracted from the ground shall, where his labor directly aided

in such production, have a lien on all such mineral bearing sands, gravels, earth or rocks whatsoever, and on all gold and gold dust or other minerals therein or which may be extracted therefrom." Or the lawmakers might simply have given a lien upon the undisturbed mining ground itself, or upon the gold and gold dust extracted therefrom. But the lawmakers used no such language. On the contrary, after designating the persons—the miners and laborers, of every description, almost—in whose favor the lien was to attach, they declared in specific and exclusive terms that such persons "shall * * * have a lien upon the dump or mass of mineral-bearing sands, gravels, earth or rocks, and all gold and gold dust, or other minerals therein, and all gold and gold dust extracted therefrom."

This language clearly designates the subject-matter of the liens; the res designatio is both unmistakable and exclusive; by the very terms of the statute, the dump or mass is particularly referred to and there can be no doubt that the lawmakers intended to confine the lien to the mineral-bearing sands, gravels, earth, or rocks, and other minerals collected and piled up in the dump or mass. The word "dump" is a term well and' definitely known in mining phraseology and operations, meaning the dirt, gravels, rocks, and sands, presumably containing gold, which has been taken from the mine and piled up or collected in a heap on the surface of the ground, to be subsequently sluiced and cleaned up and the mineral or gold dust extracted therefrom. Such, I think, is the ordinary and natural meaning of the term "dump." In Webster's International Dictionary, with the notation of its use in mining, "dump" is defined to be "a pile of ore or rock," and "mass," which is used in the same sense in the statute, is defined to be "a quantity of matter cohering together so as to make one body, or an aggregation of particles or things which collectively make one body or quantity, usually of considerable size; as a mass of ore, metal, sand or water." By reference to the Century Dictionary and Encyclopedia, the term "dump" is described as "the pile of matter so deposited; specifically the pile of refuse rock around the mouth of a shaft or adit level"—though it is sometimes referred to as a place of deposit, in which sense it is referred to in Morrison's Mining Rights, page 213. The term "dump

or mass," as used in the statute, therefore, has a distinct and well-defined meaning, and when the lawmakers wrote into the statute that a certain class of persons shall have a lien on the dump or mass of mineral-bearing sands, they meant the mineral-bearing sands piled up or collected into an aggregate heap or body, and not the mineral-bearing sands or dirt that has been only loosened or broken up, but not piled up on the surface of the ground in some place, so as to constitute a well-defined body of mineral or other matter easily and readily observable, set apart and separated from the native earth, and particularly distinguished from the mere loosened, broken, or dug-up, or thawed-out, earth.   The relation that the dump bears to the mineral dirt that has not been put into a dump may be likened to or illustrated by a manure pile and the scattered manure, or to a stack of hay and the hay that has been cut or mown, but not yet put into a stack.   A statute giving a lien specifically on the pile of manure, or the stack of hay, would hardly extend to the scattered manure, or the mown, but ungathered, hay; nor can section 164, which plainly designates the dump or mass as the subject of the lien, be construed so as to include within its scope the broken-up or thawed-out gravel and sand, that has not been piled up in a dump or mass.   In the case of Labay against the Northern Mining & Trading Company, decided in January, 1914, this court expressed the opinion that the labor and mechanics' lien statutes should be liberally construed in favor of those asserting the lien, and it will adhere to that view; but to extend a lien as contended for by the plaintiff in this case the court would be compelled to read into the statute a meaning that is not only not expressed therein, but by implication is excluded therefrom.   This the court cannot do; if it did, it would commit an act of judicial legislation— a form of legislation that cannot be too severely condemned. In reaching my conclusion in this case, I have given the statute my most careful consideration, and have been guided by those two elementary rules of interpretation, viz. that it is the duty of the courts to seek the meaning of the statute from the language of the statute itself, and, as was rather quaintly said by Lord Coke in Edrich's case, "The judges said that they ought not to make any construction against the expressed letter of the statute; for nothing can so express the

5 A.R.—14

meaning of the makers of the act as their own direct words, for 'index animi sermo'"; and second, by that rule so well expressed in the Latin maxim, "Expressio unius est exclusio alterius." The plain and unambiguous language of the statute, in my opinion, points inevitably to the dump or mass as the object of the lien, and just as inevitably excludes its extension to the sands, gravels, and other mineral substances not contained therein. An examination of section 165 and the form of notice of the lien, as given therein, as well as an examination of section 174, confirms and emphasizes the views above expressed. A lien is a charge upon specific property, and may be created by contract or by operation of law. In either event, it is essential that the property should be specifically designated before the lien may attach. In this case, sections 164, 165, and 174 refer specifically to the "dump or mass" of mineral-bearing sands, etc., and to no other property.

The temporary restraining order heretofore issued will therefore be dissolved, and the injunction requested will be denied.